UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

```
_____
                                )
WENDY DRUMM,                    )
                                )
          Plaintiff,            )
                                )
     v.                         )    CA. No. 08-232 S
                                )
CVS PHARMACY, INC.,             )
                                )
          Defendant.            )
_____)
```

**OPINION AND ORDER**

WILLIAM E. SMITH, United States District Judge.

Plaintiff Wendy Drumm ("Drumm") worked as a creative director for Defendant CVS Pharmacy, Inc. ("CVS") between 2003 and 2007, when her employment was terminated. In this action, she accuses Defendant of discriminating against her because of her age, failing to pay severance benefits, and tortiously causing her emotional distress. Presently before the Court is Defendant's Motion for Summary Judgment seeking dismissal of all claims. On the central claim of age discrimination, the only evidence of age-based bias is a single comment from Plaintiff's supervisor. While not overwhelming evidence, the remark is potentially sufficiently suggestive of discrimination to narrowly prevent summary judgment. Plaintiff's remaining claims, however, do not fare as well and cannot survive.

Accordingly, for the reasons fully explained below, Defendant's Motion is granted in part and denied in part.

I.   Background

Unless otherwise noted with respect to several critical factual disputes, the following facts are undisputed.

A.   Severance Negotiations

Plaintiff began exploring employment opportunities with Defendant in 2003.   In the course of her discussions with CVS, she asked about severance benefits.   A recruiter named Ellen Sheil responded by leaving the following message on Drumm's voice mail:

> Without sounding like we're not flexible, we would never put anything having to do with severance in an offer letter. We never have that I'm aware of, and what we do have, though, in case it's needed, in the event that someone were to be let go, typically at CVS without cause or even with cause – because we're too nice to let them just fade away – we would give them severance based on a program that we typically role out. And in the case of someone at your level, we would try to make it based on the amount of time we thought it would take the person to get re-employed. But there wouldn't be any way that we would be able to extend or write into an offer letter that you would be eligible for a certain amount of severance. What you need to be comforted by I think is that CVS is an honorable company that tries to do the right thing, and that's how we would handle that.

(Pl.'s Statement of Undisputed Facts, Nov. 20, 2009 ("Pl.'s Facts") ¶ 9.)   Plaintiff claims she later telephoned Sheil, who "confirmed" orally what Drumm understood to be the "promise" stated in the recorded message: if Defendant ever terminated

2

Drumm, she would receive severance payments until she found new employment.  (See Affidavit of Wendy Drumm, Nov. 19, 2009 ("Drumm Aff.") ¶ 8.)  Defendant disputes that Sheil made any such representation.  (See Def.'s Mem. Supp. Summ. J., Sept. 25, 2009 ("Def.'s Mem.") Ex. B 63:1-10.)

Neither the written employment offer Defendant subsequently extended to Drumm, nor Defendant's employee handbook, guarantees severance benefits.  Both the offer and the handbook state that Drumm's employment was at-will.  (Def.'s Statement of Undisputed Facts, Sept. 25, 2009 ("Def.'s Facts") ¶ 3.)

B.   Plaintiff's Job Performance

Drumm began working for CVS as Chief Creative Director in September 2003.  She was fifty-two years old at the time.  When she started, her immediate supervisor was Helena Foulkes, Senior Vice President of Marketing.  (See id. ¶¶ 1, 2.)

Foulkes claims there were problems with Drumm's job performance from 2003 through 2006.  Specifically, Foulkes asserts that, between September 2003 and March 2004, she received complaints from CVS employees and business partners about Drumm's professionalism and demeanor. (See id. ¶¶ 7-10.)[1]

_____

[1] Plaintiff disputes the characterization of her work in all the alleged complaints listed in Defendant's statement of facts, and attacks them as hearsay.  The Court recognizes them as relevant to Defendant's motivation in firing her.  See Kelley v. Airborne Freight Corp., 140 F.3d 335, 346 (1st Cir. 1998) (accepting evidence of complaints by absent declarants "to show

In March 2004, Foulkes presented Drumm with an Individual Development Plan, and counseled her to improve her listening, conflict resolution, and interpersonal skills. (<u>See</u> Def.'s Mem. Ex. B, Ex. 14 thereto.)  In October 2004, Foulkes issued a "Coaching and Counseling Form" to Drumm that raised concerns about her professionalism in interacting with a member of the human resources staff. (<u>See</u> Def.'s Mem. Ex. C, Ex. 15 thereto.)

In the spring of 2005, Foulkes allegedly received new complaints about Drumm from members of the Creative Department at CVS. (<u>See</u> Def.'s Facts ¶¶ 17-18.)  Later that year, Foulkes received another alleged complaint about Drumm from one of Defendant's business partners. (<u>See</u> <u>id.</u> ¶ 19-20.)

In early 2006, Foulkes and Drumm exchanged emails about a meeting at which they had discussed Drumm's performance.  Drumm identified two of the topics they had addressed as the need to "foster[] a good working relationship" with a member of the Human Resources department, and "Judgment." (Def.'s Mem. Ex. B, Ex. 28 thereto.)  In connection with the latter, Drumm wrote, "I need to really think things through before I act." (<u>Id.</u>)  Foulkes replied by thanking Drumm for her "openness," and writing that she needed Drumm to "make significant improvement on these issues." (<u>Id.</u>)

---

. . . that a decisionmaker had notice of the complaint, rather than to prove the specific misconduct alleged in the complaint").

4

For Drumm's 2005 year-end review, Foulkes rated her as "needs improvement." (Id. Ex. B, Ex. 31 thereto.) The review listed team management and communication as areas for improvement. (Id.) On the form, Foulkes wrote that she was "very concerned about [Drumm]'s ability to lead a team at CVS." (Id.) Foulkes thereafter created a "60 Day Plan" for Drumm that outlined performance goals. (Id. Ex. B, Ex. 32 thereto.)

However, Drumm also received positive feedback between 2003 and 2006. For her first performance review in April, 2004, Foulkes gave her a rating of "Meets Expectations." (See Pl.'s Facts ¶ 13.) Drumm received a salary increase, a bonus, and some stock options in the company. (See id.) Similarly, for Drumm's year-end 2004 review, Foulkes judged Drumm to "Meet[] Expectations," and Drumm received another salary increase, a second bonus, and additional stock options. (See id. ¶ 14.) Then, even while designating Drumm as "Need[ing] Improvement" on her 2005 review, Foulkes praised Drumm's "impressive" creative skills. (Def.'s Mem. Ex. B, Ex. 31 thereto.) As with Drumm's prior two reviews, Defendant once more granted Drumm a salary increase, bonus, and stock options. (See Pl.'s Facts ¶ 15.) Finally, for Drumm's year-end review for 2006, Foulkes raised her evaluation of Drumm's performance back to "Meets Expectations." (See Def.'s Facts ¶ 30.) And yet again, Drumm

5

received an increase in salary, a bonus, and stock options.[2] (See Pl.'s Facts ¶ 18.)

At the end of 2006, CVS hired Robert Price as a new Vice President of Retail Marketing.  In this role, he took over as Drumm's direct supervisor.  (See Def.'s Facts ¶ 26.)  Foulkes discussed Drumm's past performance issues with Price and Defendant's Director of Human Resources, Kathy-Jo Payette. Foulkes states that she raised the possibility that it might be time for Drumm to "move on."  (Def.'s Mem. Ex. C at 104:1-11.) Price claims that he asked Foulkes not to dismiss Drumm yet.  He states that he requested the opportunity to help "manag[e Drumm's] development" and help her "become a success" in her role.  (Def.'s Mem. Ex. I. at 26:2-15, 27:10-20.)  Drumm, however, disputes this testimony as self-serving and contradicted by the documentary record, including her performance evaluations.

Price alleges that he received several performance-related complaints about Drumm from her colleagues in early 2007.  (See Def.'s Facts ¶¶ 33, 35, 38-39.)  The complaints allegedly related to improper business travel, an attempt to recruit a member of another department to work on Drumm's team, and

---

[2] Defendant points to substantive feedback contained in the 2006 review as an indication that Foulkes still believed Plaintiff had performance problems.  (See Def.'s Facts ¶31.) Defendant also asserts that Plaintiff received a bonus "that was lower than the targeted amount."  (Id.)

communication and leadership deficiencies.   (See id. ¶¶ 33, 35, 38-40.)

C.   The March 2007 Comment by Price

The key evidence in this dispute is a comment allegedly made by Price to Drumm several months after he became her supervisor.   To place the remark in context, it is necessary to understand some of Defendant's marketing terminology.   CVS uses a shorthand system of three names corresponding to the letters C, V, and S to describe its targeted customer base.   The name "Sophie" refers to a "customer paradigm of a woman over the age of 65."   (Id. ¶ 45.)   According to Price, Sophie "is the heart and so[ul] of our marketing focus."   (Def.'s Mem. Ex. I 11:13-18.)   The other two names are "Caroline," who represents the youngest segment, and "Vanessa," who represents the middle. (Id.)

In late March, 2007, Price met with Drumm to discuss marketing strategy.   She alleges Price made the following comment:

> Wendy, we know all about your Sophie contemporaries. There is no need to contemplate your paradigm.   There is no empirical mystery here.   We need a younger, fresher missionary for Creative.   And Wendy, let's face it, that is not within your scope, and that is a problem for you.

(Pl.'s Facts ¶ 20.)   In substance, the majority of this comment is not in dispute.   The major exception is that Defendant denies

that Price uttered the term "Creative." Drumm's notes, taken
immediately after the meeting, do not spell out the full word,
but just write "C." (See Def.'s Facts ¶ 46.) Defendant also
argues that Drumm's grammatical reconstruction of the spoken
statement is not entirely faithful to her notes, which render
the comment as follows:

> We know everything your Sop contemporaries[,] don't
> need to contemplate your paradigm[.]  No empirical
> mystery[.]  We need a fresher younger missionary C[.]
> . . . [L]et's face it not within my scope — is a
> problem for me – (you).

(Def.'s Mem. Ex. B, Ex. 39 thereto.)

Some time between "the end of April" and the "beginning of
May," Price resolved to fire Drumm. (Def.'s Mem. Ex. I 6:4,
7:18-24.) Price "finalized [the] decision in May." (Id. 7:24.)
Defendant officially terminated Drumm's employment in July 2007,
and granted her thirteen weeks of severance pay. She was then
fifty-six years old. To replace Drumm, Defendant appointed a
woman who was thirty-seven years old to the position of Chief
Creative Director. (See Pl.'s Facts ¶ 24.)

D.   Procedural History

Plaintiff commenced this action in Providence Superior
Court in June 2008, and Defendant removed it to this Court.
Plaintiff seeks damages against Defendant on the following
grounds: (i) Defendant terminated her employment because of her
age, in violation of the Age Discrimination in Employment Act

("ADEA"), 29 U.S.C. § 621 et seq., the Rhode Island Fair
Employment Practices Act ("FEPA"), R.I. Gen. Laws § 5-28-1 et
seq., and the Rhode Island Civil Rights Act ("RICRA"), R.I. Gen.
Laws § 42-112-1 et seq.; (ii) Defendant allowed age to be a
motivating factor in terminating Drumm's employment, in
violation of FEPA and RICRA; (iii) Defendant breached a contract
with Drumm to provide severance pay; (iv) Defendant is liable to
Drumm for severance pay under a theory of promissory estoppel;
and (v) Defendant intentionally and negligently inflicted
emotional distress on Drumm.

Defendant now moves for summary judgment and asks that each
of Plaintiff's claims be dismissed.

II.  Standard of Review

Summary judgment is appropriate where there is no genuine
issue of material fact and the moving party is entitled to
judgment as a matter of law. See Fed. R. Civ. P. 56(c).  "A
genuine issue of fact exists where the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."
Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009)
(internal quotations and citation omitted).  The Court must view
the facts in the light most flattering to Plaintiff, and draw
all reasonable inferences in her favor. See Iverson v. City of
Boston, 452 F.3d 94, 98 (1st Cir. 2006); Dávila v. Corporación
de Puerto Rico Para La Difusión Pública, 498 F.3d 9, 12 (1st

Cir. 2007).  "Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show that a factual dispute does exist."  Velázquez-Fernández v. NCE Foods, Inc., 476 F.3d 6, 10 (1st Cir. 2007) (internal quotation marks and citation omitted).  Summary judgment cannot be defeated, however, "by relying on improbable inferences, conclusory allegations or rank speculation."  Id.

III. Analysis

    A.   Age Discrimination Claims

    To prevail on an ADEA claim, the plaintiff must prove "that age was the 'but-for' cause of the employer's adverse action."  Gross v. FBL Fin. Servs., Inc., 129 S. Ct. 2343, 2351 (2009). After Gross, ADEA plaintiffs can no longer rely on the "mixed motive" theory of discrimination set forth in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).  Rather, they must proceed under a "pretext" theory using the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

    To survive summary judgment under the McDonnell-Douglas standard, a plaintiff must first establish a prima facie case by adducing "facts showing each of the following: (i) that he was at least forty years old at the time of the adverse employment action complained of; (ii) that his job performance met or exceeded the employer's legitimate expectations; (iii) that his

employer actually or constructively discharged him; and (iv) that his employer had a continuing need for the services he had been performing." Torrech-Hernandez v. Gen. Elec. Co., 519 F.3d 41, 48 (1st Cir. 2008). "The prima facie showing creates a rebuttable presumption that the defendant-employer violated the ADEA. After the creation of such a presumption, the burden of production shifts to the defendant-employer to articulate a legitimate, nondiscriminatory basis for its adverse employment action." Hoffman v. Applicators Sales & Serv., Inc., 439 F.3d 9, 17 (1st Cir. 2006) (internal citations and quotation marks omitted). "If the employer is able to articulate a legitimate, non-discriminatory reason, the presumption afforded to the plaintiff's prima facie case disappears," and the plaintiff must then "show[] that the employer's articulated reason for the challenged employment action was pretextual." Id. at 17.

Circumstantial evidence, including evidence of "discriminatory comments," may be probative of pretext. See Webber v. Int'l Paper Co., 417 F.3d 229, 234 (1st Cir. 2005). However, not every biased remark raises a triable issue of fact. "[S]tray workplace remarks normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus." Torrech-Hernandez, 519 F.3d at 55 (quoting Velazquez-Fernandez, 476 F.3d at 11-12) (alterations omitted). To escape classification as a "stray remark," a

comment must be actually "discriminatory," Ramirez Rodriguez v. Boehringer Ingelheim Pharms., Inc., 425 F.3d 67, 79-80 (1st Cir. 2005); be made by "the key decisionmaker or [someone] in a position to influence the decisionmaker," id. at 79; and must relate to "the decisional process," Rios-Jimenez v. Principi, 520 F.3d 31, 40 (1st Cir. 2008) (quotation marks and citation omitted).   In particular, "statements directly related to the challenged employment action may be highly probative in the pretext inquiry."  Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 36 (1st Cir. 2001).   In addition to content, timing and context help sift "stray" comments from those connected to the decision in question.  See Gonzalez v. El Dia, Inc., 304 F.3d 63, 69-70 (1st Cir. 2002).

In general, the RICRA and FEPA standards track those of federal law.  See Neri v. Ross-Simons, Inc., 897 A.2d 42, 48 (R.I. 2006) ("This Court has adopted the federal legal framework to provide structure to our state employment discrimination statutes.")   The difference is that, in addition to pretext claims, the "mixed motive" theory still works for age discrimination under FEPA.[3]  This approach does not require "direct" evidence of bias; as in pretext cases, a plaintiff may rely on circumstantial evidence.   See Casey v. Town of

_____

[3] Where discrimination was not a but-for cause, but only a motivating factor for discharge, FEPA simply limits damages. See R.I. Gen. Laws 28-5-24(a)(2).

Portsmouth, 861 A.2d 1032, 1038 n.3 (R.I. 2004) ("[P]laintiff is correct that requiring direct evidence [of discrimination under FEPA] would constitute error."); Resare v. Raytheon Co., 981 F.2d 32, 39 & n.13 (1st Cir. 1992) (discussing the mixed motive theory embodied in R.I. Gen. Laws § 28-5-7.3).

B.   CVS's Challenge to Plaintiff's Prima Facie Case

Defendant first takes a swipe at the second leg of Plaintiff's proffered prima facie showing.  It argues that the "Needs Improvement" rating for Drumm's 2005 performance review, negative feedback about her management abilities in each of her reviews, and other performance problems raised by her supervisors demonstrate that Drumm did not meet Defendant's "legitimate expectations."  See Torrech-Hernandez, 519 F.3d at 48.  Drumm counters that her reviews showed that she "Meets Expectations" in three out of four years, including 2006. (Def.'s Facts ¶ 30.)  There was thus no "pattern of declining performance" of a type that courts have found to knock out a prima facie case of discrimination.  Johnson v. Zema Sys. Corp., 170 F.3d 734, 743 (7th Cir. 1999).  There is also no dispute that Drumm received salary increases and bonuses at the conclusion of every review period.

A plaintiff's burden to make out a prima facie case requires "only a minimal evidentiary showing."  Torrech-Hernandez, 519 F.3d at 49.  Here, the evidence that Drumm's

13

performance went from "Needs Improvement" in 2005 to "Meets Expectations" in 2006, and that she consistently earned bonuses and salary increases, easily carries that burden. See Cotton v. City of Chicago, No. 01 C 3142, 2002 WL 1284386, at *5 (N.D. Ill June 6, 2002) (rejecting a challenge to the "legitimate expectations" element despite evidence that a plaintiff had been "disciplined three times," in part because the plaintiff had "received all scheduled salary increases"); Buttell v. Am. Podiatric Med. Ass'n., 700 F. Supp. 592, 596 (D.D.C. 1988) (noting that the plaintiff received "annual bonus and salary increases" as evidence of meeting legitimate expectations despite evidence that supervisors identified performance problems).   While evidence of her shortcomings clearly establishes a non-discriminatory basis for her discharge for purposes of the second step of McDonnell-Douglas analysis, it does not shut down this action at the prima facie stage; rather, it shifts the burden back to Drumm to show that Defendant's proffered non-discriminatory reason is but a pretext for discrimination on the basis of her age.

C.   Evidence of Age Discrimination

Defendant cites substantial evidence in the record that Plaintiff had difficulty managing her creative team.   Drumm does not dispute that this carries Defendant's burden to articulate a neutral basis for her discharge.   Instead, for purposes of her

14

ADEA claim, she contends that reason was a pretext for age discrimination.  The decisive question is thus whether she can point to sufficient circumstantial evidence of bias to allow a jury to conclude that she was actually fired because of her age. In the alternative, Drumm asserts the right to relief under a "mixed motive" framework for discrimination pursuant to state law.  For this theory, the question is whether Drumm can identify sufficient evidence to allow a jury to conclude that age-based bias played a role in Defendant's decision, notwithstanding the existence of other reasons.

To both of these ends, Drumm relies exclusively on Price's March 2007 comment.  As fully explained below, the remark may reasonably be interpreted as expressing the belief that Drumm was too old to do her job and should be replaced with someone younger.  Therefore, summary judgment is inappropriate, and a jury must decide why Drumm was let go.

1.   The "same-actor" inference

As an initial matter, Defendant argues the Court can reject Plaintiff's pretext theory on the basis of Price's discussions with Foulkes and Payette in late 2006.  There is no dispute that Price made the decision to fire Drumm, along with Payette.  (See Def.'s Facts ¶ 41.)  What his 2006 dialogue with Foulkes and Payette shows, according to Defendant, is that Price was also responsible for saving Drumm's job five months earlier.  The way

Defendant tells it, Foulkes floated the idea of discharging Drumm, but Price intervened because he thought he could help Drumm succeed.

Having thus stood up for Drumm, who was already over fifty years old when Price joined the company, why would he suddenly develop age-based prejudice against her? That, Defendant asserts, would be implausible; instead, the Court should draw the inference that age was not the reason for his decision. Defendant relies on the principle that, "[i]n cases where the hirer and firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 847 (1st Cir. 1993) (internal citation and quotation marks omitted).

Under the circumstances, Defendant's invocation of the "same actor" inference rests on an insufficiently solid foundation to allow for summary judgment. Defendant's argument is premised on the idea that saving someone from being fired is the same as hiring that person. This would allow Price, in effect, to step into the shoes of Drumm's hirer. Even assuming this extended variation on the same-actor inference would be legally appropriate, Drumm disputes the substance of the conversation Price held with Foulkes and Payette. (See Pl.'s

16

Statement of Disputed Facts, Nov. 20, 2009 ("Pl.'s Dispute") at
2.)   She argues their after-the-fact testimony is "self-serving
and contradicted by contemporaneous documents."   (Id. at 3.)
The Court is obliged to grant "all reasonable inferences" in
Drumm's favor.   Straughn, 250 F.3d at 34.   Defendant would turn
this rubric on its head; it asks the Court to accept its
characterization of the exchange among Price, Foulkes and
Payette, and reject Drumm's argument that the conversation
cannot have occurred as Defendant describes it.   Yet, a
reasonable jury could take Drumm's performance evaluation for
2006 — the time period during which her poor work allegedly
justified termination — as a basis for doubting that she was on
the threshold of dismissal and pulled back from the brink by
Price.   While it is true that the review does substantiate
Defendant's assertion that Drumm received negative feedback,
(see Def.'s Mem. Ex. B., Ex. 38 thereto, at 8), it also gives
Drumm an overall rating of "Meets Expectations," and praises her
creative work.   (See Def.'s Mem. Ex. B., Ex. 38 thereto, at 7
("All [Drumm's] key stakeholders see [her] as providing
excellent Creative work.   She has earned the Merchants' respect
based on her talent.   [Drumm] has taken the work to a new level
and has also been much better with the Merchants around
listening.").)

In other words, there is a genuine dispute of fact as to whether Drumm was hanging by a thread before Price stepped in, or instead on solid footing.  This factual dispute erodes the keystone of the modified same-actor inference Defendant seeks: the proposition that Price might as well have hired Drumm. Defendant, of course, is entitled to argue at trial that Price harbored no bias, based on testimony that he stuck his neck out for Drumm.  Indeed, a jury instruction on the inference may well be appropriate at trial.[4]  But factual uncertainty about the elements of the same-actor inference precludes summary judgment at this stage of proceedings.  See Quinby v. WestLB AG, No. 04 Civ. 7406 (WHP), 2007 WL 1153994, at *8 (S.D.N.Y. Apr. 19, 2007) (repudiating same-actor inference because, in part, there were "disputed issues of fact regarding whether it was [the firer or another person] who hired [p]laintiff"); Stuart v. Metro. Gov't of Nashville & Davidson County, No. 3:06-cv-1000, --- F. Supp. 2d ----, 2009 WL 5196066, at *8-9 (M.D. Tenn. Dec. 21, 2009) (rejecting same actor inference in part because "it [was] not clear that the plaintiff was hired and then subjected to the adverse employment action by precisely the same person").

2.    Substance of Price's comment

This dispute boils down to whether Price's alleged comment can reasonably be viewed as evidence of age-based animus, or

---

[4] The Court will reserve this issue for a later time.

18

whether, as Defendant contends, it is a mere "stray remark" that cannot defeat summary judgment.   Drumm recalls the remark as follows:

> Wendy, we know all about your Sophie contemporaries. There is no need to contemplate your paradigm.   There is no empirical mystery here.   We need a younger, fresher missionary for Creative.   And Wendy, let's face it, that is not within your scope, and that is a problem for you.

(Pl.'s Facts ¶ 20.)   "[C]onstru[ing] the record in the light most favorable" to Drumm, <u>Meuser v. Fed. Express Corp.</u>, 564 F.3d 507, 515 (1st Cir. 2009), the Court must accept her version of the statement for purposes of considering what a reasonable jury might take as evidence of discrimination.[5]   In addition, Defendant does not dispute that the most damning parts of what Price said, including the reference to a "fresher, younger missionary," and the phrase, "Let's face it, not within [your] scope, is a problem for [you]," appear in Drumm's contemporaneous notes.   (Def.'s Facts ¶ 46.)

Moreover, Price's alleged warning to Drumm cannot be dismissed as simply a "stray remark."   First, there is no dispute that Price was a "key decisionmaker."   <u>Ramirez Rodriguez</u>, 425 F.3d at 79.   Second, the terms "fresher, younger

---

[5]   Defendant attempts to preclude Plaintiff from alleging that Price said he needed a missionary "for Creative" as inconsistent with prior sworn testimony, but Plaintiff did use exactly that phrase at her deposition.   (<u>See</u> Def.'s Mem. Ex. B 230:24-231:10.)

missionary" explicitly refer to age.  And the declaration that this was "not within [Drumm's] scope" and was "a problem" for her, indicates that Price thought Drumm could not serve as the "missionary" Price wanted because of her age.  Thus, a straightforward reading of Price's statements is that they are "discriminatory" because they express age-based bias.  <u>See</u> <u>id.</u> at 79.

Third, the last two sentences of the comment reflect a relationship to "the decisional process."  <u>Rios-Jimenez</u>, 520 F.3d at 40.  Taken together, they clearly convey the message that it was a "problem" that Drumm could not be the "younger, fresher missionary" Defendant needed for the Creative department.  A reasonable jury could find that the "problem" was Drumm's age, and this motivated Price to let her go.  In terms of timing, Price's comment falls within the zone of relevance recognized in case law for evidence of pretext.  He decided to fire Drumm in April or early May, 2007, at most a little more than a month after the March 27 comment.  <u>Compare</u> <u>Santiago-Ramos</u> <u>v. Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 55 (1st Cir. 2000) (recognizing comments made two weeks prior to employment decision as evidence of pretext) <u>and</u> <u>Kelley v. Airborne Freight</u> <u>Corp.</u>, 140 F.3d 335, 347-48 (1st Cir. 1998) (finding a decisionmaker's statement nine months prior to termination to be relevant evidence) <u>with</u> <u>Mulero-Rodriguez v. Ponte, Inc.</u>, 98 F.3d

670, 676 (1st Cir. 1996) (finding comments made eight months
before discharge were too remote).

In sum, Price's cautionary words to Drumm display classic
characteristics of remarks that preclude summary judgment: they
explicitly refer to age and presage Drumm's replacement with a
younger employee. See, e.g., Duval v. Callaway Golf Ball
Operations, Inc., 501 F. Supp. 2d 254, 265-66 (D. Mass. 2007)
(taking a decisionmaker's comment during a speech that guests
would "notice a lot of young faces," and "that's not by
accident, that's by design" as evidence of pretext); Warren v.
Nevada Coaches, LLC, No. 2:06-CV-0035-RCJ-LRL, 2007 WL 2084881,
at *4 (D. Nev. July 18, 2007) (taking a stated preference for
"younger blood" and "fresh blood" as evidence of pretext); see
also Ezell v. Potter, 400 F.3d 1041, 1051 (7th Cir. 2005)
(taking a comment about "get[ting] rid of older carriers and
replac[ing] them with younger, faster carriers" as evidence of
discrimination).[6]

---

[6]    Price's remarks provide stronger evidence of
discrimination than in the cases cited by Defendant.  To cite
one example, in Straughn, an employee who played a "subordinate
role" in the dismissal decision had on occasion used an
offensive "southern black" accent during meetings with the
plaintiff, but not "during or in relation to" the challenged
employment action.  Straughn, 250 F.3d at 36-37.  Here, Price
played the central role in firing Plaintiff, and as explained
above, it is reasonable to view his potentially ageist remark as
"relat[ing] to" that action.  Similarly, in Ayala-Gerena v.
Bristol Myers-Squibb Co., 95 F.3d 86, 97 (1st Cir. 1996), the
individuals who made racial comments had no hiring or firing

Defendant attempts to drain Price's remarks of portent by emphasizing the context of the conversation he was having with Drumm at the time.  Observing that, as a woman over fifty, she herself was closer than other executives to the sixty-five-and-over "Sophie" paradigm Defendant uses for marketing, Drumm allegedly shared some ideas for targeting the "Sophie" audience. The gist of Price's response, Defendant pleads, was only to tell Drumm she was barking up the wrong tree.  He did not want Drumm to fixate on the "Sophie" paradigm, and instead stated "a preference to focus on Caroline as a 'younger fresher missionary.'"  (Def.'s Mem. at 7.)  Given this alternative reading, Defendant argues Price's comment is at best ambiguous, and at worst completely incomprehensible.  Either way, Defendant asserts it is insufficient as a matter of law to overcome the evidence of Drumm's poor management skills and allow her to reach a jury on her discrimination claims.

Even if Price's terminology can be viewed as ambiguous (or gobbledygook),[7] this does not secure summary judgment for

_____

authority over the plaintiff, unlike Price in this case.  In Gonzales, the plaintiff "identified neither the time nor the context" of ageist remarks, and could not state whether they had been made "at a time proximate" to the decision at issue. Gonzales, 304 F.3d at 69-70.  Again, that is not the case for Plaintiff here.

[7] Of course, it is not up to the Court to weigh the evidence at this stage, but Defendant's interpretation is less than convincing.  Why would Price refer to "Caroline," the abstract representation of a customer segment, as a "missionary?"  In the

Defendant.    True,  federal  courts  previously  required  "direct"
evidence   to   proceed   with   a   "mixed  motive"  theory   of
discrimination,  and  found  that  "ambiguous"  comments  did  not
suffice.   See, e.g., Vesprini v. Shaw Contract Flooring Servs.,
Inc., 315 F.3d 37, 42 (1st Cir. 2002) (finding that a comment
that the plaintiff should "step back and let the young stallions
run the [day to day] business" could have merely been a "non-
actionable reflection on generational passage").    However,  in
the Title VII context, the Supreme Court abolished the "direct
evidence" requirement in Desert Palace, Inc. v. Costa, 539 U.S.
90, 101-02 (2003).   In any event, after Gross, Drumm cannot rely
on the "mixed motive" model for her ADEA claim, because she must
show that age was a "but-for" cause of her termination.    See
Gross, 129 S. Ct. at 2351.   The direct versus indirect analysis
thus  would  have  no  relevance  to  her  federal  claim  even  if
"direct"  evidence  were  still  necessary  to  bring  a  mixed-motive
case.

        In   fact,   even   when   applying   the   now-defunct   "direct
evidence"  requirement,  the  First  Circuit  acknowledged  that  the
very same "ambiguous" comments that previously could not carry a
mixed-motive   claim   may   nevertheless   serve   as   circumstantial
evidence  of  pretext.    See  Fernandes  v.  Costa  Bros.  Masonry,

---

end, it will be for a jury to decide between these various
interpretations.

<u>Inc.</u>, 199 F.3d 572, 583 (1st Cir. 1999) (finding that an ambiguous comment "which in terms bears upon [the defendant's] repeated refusals to rehire the appellants, sufficiently implicates the decisional process to avoid classification as a stray remark"), <u>abrogated on other grounds by</u> <u>Desert Palace</u>, 539 U.S. at 101-02.[8]

For the reasons stated above, Plaintiff has adduced sufficient evidence of age discrimination to defeat summary judgment. Defendant's motion with respect to her ADEA, RICRA, and FEPA claims must therefore be denied.

B.   Breach of Contract and Promissory Estoppel

In addition to her central claim of age discrimination, Plaintiff has asserted a claim for severance benefits for the duration of her unemployment following dismissal. Defendant's liability arises from breach of contract and promissory estoppel, according to Drumm. There is no dispute that her written employment documents do not provide for severance. Rather, Drumm contends that the voicemail left by Sheil, and Drumm's subsequent conversation with Sheil, establish either a contract or legally-binding pledge to pay Drumm's salary until

---

[8] As for state law, Rhode Island does not require "direct" evidence to prove claims of discrimination, whether styled as mixed-motive or pretext actions. <u>See</u> <u>Casey</u>, 861 A.2d at 1038. Accordingly, even if arguably ambiguous, Price's comment is cognizable as circumstantial evidence of bias for purposes of all Plaintiff's discrimination claims.

she found a new job, separate and apart from her written contract.[9]  Neither of these theories is sustainable.

The parties agree that Rhode Island law governs the contract and promissory estoppel claims.  In this state, "[f]or parties to form an enforceable contract, there must be an offer and an acceptance."  Opella v. Opella, 896 A.2d 714, 719-20 (R.I. 2006); see Smith v. Boyd, 553 A.2d 131, 133 (R.I. 1989) ("Under traditional contract theory, an offer and acceptance are indispensable to contract formation, and without such assent a contract is not formed.").  With limited exceptions not applicable here,[10] identifying an offer and acceptance is necessary to demonstrate that "[e]ach party . . . ha[s] and manifest[s] an objective intent to be bound by the agreement."  Opella, 896 A.2d at 720; see Smith, 553 A.2d at 133 (explaining that courts in Rhode Island must "look to an external interpretation of the party's or parties' intent as manifested by action"); see also Mills v. R.I. Hosp., 828 A.2d 526, 528 (R.I. 2003) ("[A] litigant must prove mutual assent or a meeting

---

[9] Presumably because Plaintiff claims that the alleged contract or promise is collateral to her written agreement, and not something that sheds light on the document itself, Defendant does not raise a statute of frauds objection.

[10] Plaintiff does not, for instance, assert that the conduct of the parties was such as to substantiate the existence of an implied contract notwithstanding the absence of a formal offer or acceptance.  See Restatement (Second) of Contracts § 22 cmt. b (1981).

of the minds between the parties.") (citation and internal quotation marks omitted).

It is true that whether a contract materialized "is ordinarily a question of fact for the factfinder." Marshall Contractors, Inc. v. Brown Univ., 692 A.2d 665, 670 (R.I. 1997); accord Bina v. Providence Coll., 39 F.3d 21, 27 (1st Cir. 1994) (applying Rhode Island law). But in this case, even considering the voicemail and the alleged conversation with Sheil in the light most favorable to Drumm, no reasonable jury could find that Defendant objectively intended "to be bound" to the commitment Drumm describes.

Construing Drumm's allegations broadly, she contends that the facts fit one of two patterns of contract formation, neither of which works. First, Drumm portrays the voicemail from Sheil as an acceptance of Drumm's prior request for "a full severance package." (Drumm. Aff. ¶ 7.) Drumm affirms that she "took [the voice mail] to be an acceptance of my request for guaranteed continuation of my salary until I found suitable alternative employment." (Id.) Second, her allegations might also be read to allege that the voicemail constituted an offer that Drumm later accepted during the follow-up call. The problem with both of these theories is that there is no congruity between the deal Drumm claims she made and what Sheil said in the message:

> [W]e would never put anything having to do with
> severance in an offer letter. . . . [T]ypically . . .
> we would give . . . severance based on a program that
> we would typically [roll] out.  And in the case of
> someone at your level, we would try to make it based
> on the amount of time we thought it would take the
> person to get re-employed.  But there wouldn't be any
> way that we would be able to extend or write into an
> offer letter that you would be eligible for a certain
> amount of severance.

(Pl.'s Facts ¶ 9.)  No reasonable jury could interpret the
voicemail as an acceptance of Drumm's purported request to be
paid her full salary until she found a new job.  "To be
effective, an acceptance must be definite and unequivocal."
Ardente v. Horan, 117 R.I. 254, 259 (R.I. 1976).  Sheil did not
definitely and unequivocally state that Defendant agreed to
provide a severance package covering the full period of
unemployment Drumm would face if discharged.  In fact, she did
not unequivocally agree to anything.  She only described what
would "[t]ypically" occur in the "case of someone at [Drumm's]
level."  (Pl.'s Facts ¶ 9.)

Moreover, even assuming Sheil were not speaking
hypothetically, such that her message could be viewed as a
counteroffer to Drumm's request, Sheil did not propose to pay
Drumm's salary for the duration of her unemployment.  See
Ardente, 117 R.I. at 259-60 ("An acceptance which is equivocal
or upon condition or with a limitation is a counteroffer.").
She ventured that Defendant would "try" to provide payments

based on the amount of time that Defendant "thought" it would
take the hypothetical employee to get a new job.  If anything,
Sheil's hesitance communicated the intent <u>not</u> to be bound by
contract.  At a minimum, there is no reasonable way to interpret
the voice mail as a "guaranteed continuation of [Drumm's]
salary" pending re-employment.  (Drumm. Aff. ¶ 7.)  Thus,
assuming Drumm accepted the terms stated in Sheil's voicemail
during the follow-up call, and that the parties thus formed an
oral contract, it does not provide for the benefits Drumm
seeks.[11]

In short, the only reasonable conclusion is that Defendant
did not agree to the deal Drumm wanted.  The fact that Drumm

---

[11]   Paragraph eight of Plaintiff's affidavit might be
misconstrued as proposing a third scenario: the parties
exchanged an offer and acceptance during the subsequent
telephone conversation between Plaintiff and Sheil.  Plaintiff
states, "[Sheil] confirmed to me that CVS's promise was that if
my CVS employment were to be terminated for any reason, CVS
would pay me my salary until I found new employment."  (Drumm
Aff. ¶ 8.)  Viewed in isolation, Sheil's alleged reference to
"CVS's promise" could be mistaken for an offer that went beyond
whatever she promised on the voicemail (which, as discussed, was
little to nothing).  (Drumm Aff. ¶ 8.)  In context, however,
"CVS's promise" refers to the one Sheil allegedly made in the
recorded message, not a new offer with better terms.  Plaintiff
states that, during the call, she "confirm[ed] what [she]
understood to be [Sheil's] intention in the recorded message she
left" (<u>id.</u>), and insists that "[t]he audio recording was the
communication by which CVS accepted [Plaintiff's] condition of
severance agreement."  (Pl.'s Disputed Facts ¶¶ 4-5.)  Thus,
Plaintiff's allegations leave no room for the "improbable
inference" that she extracted a more favorable commitment than
the one contained in the voicemail during the follow-up call.
<u>Velázquez-Fernández</u>, 476 F.3d at 10.

understood differently cannot raise a triable issue of fact on her contract claim.  See Weaver v. Am. Power Conversion Corp., 863 A.2d 193, 200 (R.I. 2004) (affirming summary judgment despite evidence of the plaintiff's subjective intent to enter a contract).

It is even clearer that summary judgment is appropriate on Drumm's promissory estoppel claim.  To succeed, Drumm must establish that Defendant made a "clear and unambiguous" promise to abide by the severance terms she seeks.  Filippi v. Filippi, 818 A.2d 608, 626 (R.I. 2003).  As noted, the record does not support any reasonable conclusion that Defendant agreed to them. At best, it shows Defendant offered to pay an amount of severance that Defendant itself would determine to be appropriate in the event of Drumm's termination.  This falls far short of a clear, unambiguous promise to maintain Drumm's full salary until she found a new job.  In fact, inducements that speak much more plainly do not qualify as clear enough for promissory estoppel purposes.  For instance, Filippi involved the declaration, "I want you to come back and run [the family business] for me," "and if you do this for me, [the business] will be yours and you will take care of the family."  Id. at 626.  These statements flunked the promissory estoppel test, because they were subject to several possible interpretations about the scope of the pledge.  See id. (explaining that the

29

statement "failed to indicate whether [the speaker] meant . . .
the business including the good will or simply the stock of [a
holding company], which owned the physical assets of [the
business]"). Given the high bar to meeting the clear and
unambiguous requirement, no reasonable fact finder could
conclude that Sheil's representations measure up.

For each of these reasons, Defendant is entitled to summary
judgment on Plaintiff's contract and promissory estoppel claims.

C.   Emotional Distress

Defendant attacks Plaintiff's claims for negligent and
intentional infliction of emotional distress on two fronts.
First, it argues that they fall within the broad exclusivity
provision of the Rhode Island Workers Compensation Act ("WCA"),
which would mean that they cannot be brought in this Court.[12]
Second, Defendant contends that the emotional distress claims
fail on the merits.

While Defendant's first argument might present a close
question,[13] the Court need not address it.   Even if the

---

[12] The WCA commands that its remedy for workplace injuries
"shall be in lieu of all rights and remedies as to that injury
now existing, either at common law or otherwise against an
employer." R.I. Gen. Laws 1956 § 28-29-20 (2010).
    [13] Compare Iacampo v. Hasbro, Inc., 929 F. Supp. 562, 582
(D.R.I. 1996) (finding that "the WCA provides the exclusive
remedy for claims . . . [for] intentional infliction of
emotional distress in the workplace") with Cady v. IMC Mortgage
Co., 862 A.2d 202, 212 (R.I. 2004) (finding that the "majority
of" plaintiff's numerous claims related to the termination of

exclusivity measures in the WCA do not apply, Drumm fails to respond to Defendant's challenge to the merits of her claims. She points to no evidence demonstrating that Defendant's conduct strayed "beyond all possible bounds of decency," such that it was "utterly intolerable in a civilized community," as would be required to prove the intentional tort. Swerdlick v. Koch, 721 A.2d 849, 863 (R.I. 1998). Nor does she identify evidence that she "experienced physical symptoms of [the] alleged emotional distress, and that expert medical testimony supports the existence of a causal relationship between the putative wrongful conduct and [the] injuries," as she would need in order to prove the negligence claim. Hawkins v. Scituate Oil Co., 723 A.2d 771, 773 (R.I. 1999).

In the absence of any guidance from Plaintiff, the Court lacks a basis for finding a factual dispute about these core elements of her tort claims. Defendant is therefore entitled to judgment on both.

VI.  Conclusion

For the reasons explained above, Defendant's motion is DENIED in part and GRANTED in part. The Court grants judgment in favor of Defendant on Plaintiff's contract, promissory estoppel, and emotional distress claims, which are hereby

employment, as opposed to injury arising from workplace activity, "are beyond the purview of the WCA," but not addressing the emotional distress claims specifically).

31

dismissed.   The Court denies summary judgment with respect to Plaintiff's ADEA, RICRA, and FEPA claims.

IT IS SO ORDERED.


*William E. Smith*
William E. Smith
United States District Judge
Date:  April 2, 2010